# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**UNITED STATES OF AMERICA**

**v.**                                             **Case No. 8:22-cr-410-MSS-AAS**

**JAMES JOHN HALL**

_____/

### SENTENCING MEMORANDUM

James Hall sold an undercover agent a makeshift bomb he had cobbled together from legal explosives and duct tape.  He engaged in some tough talk with a confidential informant while negotiating the sale, but none of it was true:  he'd never blown up a car, he never intended to use the bomb to attack anyone, the bomb was not full of shrapnel, and he didn't have the material to make more.  There is little reason to believe the bomb would have operated as intended.  James has a criminal history category of I, and is much needed at home, where he is the primary caregiver, and where his wife, Stephanie, has been struggling to keep a job and care for the couple's two children.  For these reasons, this Court should impose a sentence of time served (amounting to about eight months' imprisonment), and a period of supervised release that includes a condition of home confinement.

James is 34 years old and was born in Eustis, Florida, but spent most of his childhood and young adulthood in Ohio.  His mother was a drug addict and his father an alcoholic.  His father was absent, and he suffered physical abuse at the

hands of his mother's various boyfriends until the time he was eight years old.  Then, he began to live with his grandmother, who loved and supported him, though she was impoverished.  James began using drugs as a teenager and was diagnosed with depression, anxiety, and attention deficit hyperactivity disorder.  He dropped out of school to "run the streets."

James moved back to Florida at age 21, and started a lifelong addiction to opiates.  As opiate addictions go, his was pretty uneventful, as he was neither charged nor convicted of any crimes during his period of active use of the drugs.  He enrolled himself in a rehabilitation program in 2011 or 2012, successfully completed a 60-day inpatient program, and began the use of Subutex, which he would take for the next 10 years.

Subutex is a drug prescribed for opiate use disorder, designed to stop withdrawal symptoms and prevent the effect of recreationally used opiates.  Subutex served James exceptionally well, keeping him clean for a decade with the exception of a single relapse when he was 33 years old.  He took Subutex every day, and every day he avoided opiate use and the pain of withdrawal.

That changed when he was arrested and detained in this case.  The jail failed to provide James with Subutex or anything like it.  Having staved off withdrawal for a decade, he suffered through its agony over a period of several days while isolated from his family, because the jail refused to provide him with a readily available

2

medication that would have spared him this pain.  Having suffered through this experience, James's preference now is to remain off of Subutex in the future.

James married Stephanie Molina in 2014.  The couple lives a modest lifestyle in Zephyrhills, Florida.  Stephanie works long hours as a surgical technician, and James is a stay-at-home dad for their two children, Sasha, age 8, and Archer, age 5.

James's weakness may be for what in some circles is called "tactical stuff."  In 2019, while working as a security guard at a National Guard armory, he stole three pairs of night vision goggles to use for hunting.  He pled nolo contendere, and the court withheld adjudication.  He was placed on probation, which he served successfully, having been granted early termination by the Court.  This offense accounts for James's sole criminal history point.

As the instant offense, James made a crude bomb.  The presentence report uses the technical language of the ATF explosives examiners, but, put in plain English, the bomb was supposed to work in three phases.  First was a fuse – a string of flammable substance designed to burn slowly.  The operator of the bomb was to light the end of the fuse, and its slow burn would allow the operator to get a safe distance away before the rest of the bomb ignited.

Second was the pipe.  The bomb included a roughly six-inch length of metal pipe, covered at each end with metal, screw-on caps.  The pipe was filled with an explosive powder.  One of the caps had a hole in it, and the fuse was inserted into

this hole and secured there with duct tape.  The idea was that the fuse would burn

into the pipe, ignite the powder, and cause an explosion.  This much of the device

probably would have worked:  the fuse probably would have burned into the pipe

and ignited the powder, and the pressure from the explosion probably would have

been enough to burst the pipe.



However, the pipe was not really the bomb, the pipe was there only to ignite

the third component, the Tannerite.  Tannerite Exploding Targets are a legal,

commercially available "binary explosive" meant for marksmanship.  Each target

consists of a tub of two powders.  The marksman must first mix the two powders,

thereby activating the target.  Then, he places the target and takes aim at it.  If the

target is squarely hit by a sufficiently large bullet with sufficient force, the target will

explode.  Because the shooter is able to see the explosion at a distance, he knows whether he has hit his mark immediately from his shooting position, and is relieved of the need to inspect the target at close range, as would be the case, for example, with a paper target.



The device in this case included five tubs of Tannerite.  James explained to an ATF agent that he got the Tannerite at a local retail store.  All of the components were wrapped together in duct tape, so that the pipe was kept close to the Tannerite. The *idea* behind the operation of the device was that, once the pipe burst, pieces of the pipe's metal skin would propel in various directions and strike the Tannerite tubs, causing them to explode, just as a bullet would.  Thus, all five tubs of Tannerite

would ignite roughly simultaneously, causing a significant explosion.  The Tannerite

provided the main force behind the device and was the primary source of its

dangerousness.



The problem, though, is that no one tested the functioning of the intended

third phase, no one knows whether it would have worked, and there is good

evidence that it would not have.  The ATF reports on explosives examinations are

drafted very carefully; words like *would* and *could* do a lot of work in them.  In this

one, the examiner wrote, "The explosion of the sealed pipe *would* propel fragments of

the metal pipe and end caps in all directions at significant velocities and *could* cause

the attached containers of [Tannerite] to explode."  PSR ¶ 21 (emphases added).  The

ATF went no further to determine whether the Tannerite actually would have exploded. The Government did not, for example, construct a similar device and detonate it to see what would happen, as it could have. *Cf. United States v. Spoerke*, 568 F.3d 1236, 1243 (11th Cir. 2009) (describing an investigation in which agents reconstructed the defendant's device, tested it, and video-recorded the results to present to the court).

What's more, the manufacturer's information available from Tannerite indicates that Mr. Hall's slapdash device may not have worked as he intended. Tannerite explains that the targets "will only ignite if hit with a large enough projectile traveling 2,000 feet per second." PSR ¶ 22. That is, "[t]o reliably initiate, Tannerite brand targets need to be hit solidly with a transonic (ital) round. A transonic round is one going 2,000 feet per second or faster. All other things being equal, larger diameter bullets work better than smaller ones." In response to a "frequently asked question," the company explains that the target may not explode if "shot with a hand gun, .22, shot gun or low caliber rifle," or if the target was struck by a ricocheting round. *See* https://tannerite.com/binary-target-faq/. If shooting Tannerite squarely with a handgun or shot gun will not ignite it, Mr. Hall's plan for randomly propelled pieces of metal pipe to strike it was not likely to work.

James talked to an associate about the bomb he had created, and the associate, who it turned out was a confidential informant, contacted law enforcement. After

7

that, law enforcement orchestrated a sale of the bomb to an undercover officer. In discussing the sale, James said a few things that rightfully aroused law enforcement's concern. In an unrecorded call, James told the informant that he had constructed the bomb to attack one Kiko, who had attracted law enforcement attention toward James by using a gun James sold him in a robbery. Doc. 64 at 4. During the same call, the informant told James that someone he knew may be interested in purchasing the bomb, with an eye toward blowing up an old vehicle on his property.

In a recorded call controlled by law enforcement, the informant said to James, "You don't know how to do it . . . if we could hook a phone up to it . . . we could probably hook a phone up to it . . . or you just got to light that bitch, right?" James responded that the bomb had a ten-minute timer on it, and that the informant would have to get forty or fifty yards away because the device had ball-bearings, pennies, and other intended shrapnel in it. In response to the informant's question on whether the bomb would destroy a car, James said it would, as he had used a bomb half the size to destroy a car. James repeated the assertion that he had intended the bomb "for" someone in particular. When the informant said that his associate might want to buy more devices, James responded that he had all the materials to make more. When the undercover officer purchased the device from James, James repeated his assertions that it contained shrapnel and that he had built it to use against someone.

8

None of these concerning statements was true.  In response to interrogation, James explained that he had not meant the bomb for anyone, he was just trying to "work up" the informant.  He explained to the probation officer that he was trying to sound "tough."  He told the agent he had never blown up a car with a bomb in the past, but had blown up a lawnmower by shooting a Tannerite target on it six or seven years earlier.  The examination of the bomb showed it to contain no ball-bearings, pennies, or any other shrapnel.  And a search warrant executed at James's house revealed one additional exploding target, some more fuse, and some powder meant for reloading expended bullet casings, but no extensive cache of bomb-making materials, as James had suggested to the informant.

Sasha and Archer were home when the police arrived to search the house. The police ordered the children out of the house and took them to a neighbor.  Since James's arrest, Sasha has had night terrors and Archer has suffered from bedwetting, and both children are in counseling for the stress of their father's absence.  Stephanie Molina has worked overtime to be able to pay for babysitters to watch the children while she is away at work.  Of course, she needs more babysitters still to cover her overtime work, and so on.  She writes to this Court to emphasize that she sees the good in James despite his flaws, and that she plans to provide him counseling upon his release to deal with his difficult past.

This Court should sentence Mr. Hall to time served and supervised release

with a period of home confinement to provide sufficient punishment, while returning

him to his role as family caretaker.  The Sentencing Guidelines contemplate a

departure based on a defendant's family responsibilities.  *See* U.S.S.G. § 5H1.6.

Under this departure, Courts are to consider the seriousness of the offense, the

involvement in the offense of members of the defendant's family, and the danger to

the defendant's family as a result of the offense.  *See id.* § 5H1.6 cmt. n.1(A).  Where

the departure would be based on the family's loss of caretaking, the following

circumstances should be present:

> (i) The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking . . . to the defendant's family.
>
> (ii) The loss of caretaking . . . substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant.  For example, the fact that the defendant's family might incur some degree of financial hardship or suffer to some extent from the absence of a parent through incarceration is not in itself a sufficient basis for a departure because such hardship or suffering is of a sort ordinarily incident to incarceration.
>
> (iii) The loss of caretaking . . . is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking . . . irreplaceable to the defendant's family.
>
> (iv) The departure effectively will address the loss of caretaking.

*Id.* § 5H1.6 cmt. n.1(B).

Here, each of the factors cuts in favor of a caretaking departure. While the offense, like most, is a serious one, it is not as serious as it may appear at first blush. While any construction of a bomb creates a serious risk, Mr. Hall thought this bomb would go toward blowing up an old vehicle on someone's property (apparently for sheer entertainment value). He never intended to use it to do any harm, thought he boasted he did. And it probably would not have worked as intended. Mr. Hall's offense was serious, but not as serious as it at first seems, and not so serious that he should be disqualified from the family caretaking departure. Further, his offense did not harm his family and his family was not involved.

Further, all of the required circumstances for the departure are present. The loss of Mr. Hall's caretaking of Sasha and Archer is direct and specific, not some generalized loss of family assistance. His loss substantially exceeds the harm ordinarily incident to incarceration, as demonstrated by the children's symptoms and need for counseling, and the vicious cycle of overtime, babysitters, and more overtime in which Stephanie has found herself. In the eight months of Mr. Hall's detention, Stephanie has been unable to find any other "remedial or ameliorative" program to make up for his loss. Lastly, Mr. Hall's requested sentence of time served plus home detention will effectively address the loss of his caretaking by putting him at home with Sasha and Archer, where he is needed.

Finally, Mr. Hall's history and circumstances favor his requested sentence.

11

Mr. Hall grew up in neglect and abuse until he graduated to running the streets on his own and using drugs. Despite this, he is in the lowest criminal history category, he quite successfully rehabilitated himself from his opiate addiction, and he went on to become a loving and supportive father and husband. The eight months he has served in pretrial detention serve as sufficient punishment and deterrence, especially given the agony the jail put him through in denying him Subutex and allowing his withdrawal. A period of home detention will serve as a daily reminder of his punishment and to protect the public, while allowing him to care for his children and continue his rehabilitation on supervised release. Home detention therefore constitutes a sentence that is sufficient but not greater than necessary to meet the goals of federal sentencing.

DATED this 3rd day of July 2023.

Respectfully submitted,

A. FITZGERALD HALL, ESQ.
FEDERAL DEFENDER

/s Samuel E. Landes
Samuel E. Landes, Esq.
D.C. Bar No. 1552625
Assistant Federal Defender
400 North Tampa Street
Suite 2700
Tampa, Florida 33602
Telephone: (813) 228-2715
Email: Samuel_Landes@fd.org

12

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 3rd of July 2023, a true and correct copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will send a notice of the electronic filing to:

AUSA Samantha Newman.

/s **Samuel E. Landes**
Samuel E. Landes, Esq.
Assistant Federal Defender

# Stephanie Molina

5503 10th St. Zephyrhills, Fl 33542

(352)430-5184

Honorable Mary S. Scriven

United States District Judge U.S. Courthouse

201 N. Florida Ave.

Tampa, Fl 33602

Re: United States v. James John Hall

Dear Judge, Scriven:

I hope this letter finds you well. I'm Stephanie Molina, I'm a devoted mother, understanding wife, and overall, a good person. I've been in the medical field for 15yrs as a Patient Care Tech. I have worked from nursing homes to one of the best hospitals in the Tampa area Advent Health Wesley Chapel. My dream one day is to either pursue nursing or be in the OR whenever I have the availability and when I'm not the sole provider of the family. James and I have 2 beautiful children, Sasha who is 8 and my son who is 5. They miss their father very much.  I'm one of the hardest workers you would ever meet. Every floor in this hospital knows me, enjoys working with me and values me. So much so that I was one of the first to win the Sunflower award for Patient Care Tech throughout the entire hospital. For the past 3 years I have been working a lot of overtime to provide for my family while James was the stay-at-home parent. My family and friends know me as a hard worker, a good mother, and someone who is the upmost caring toward others. I saved my first life by performing CPR on a patient which just made me fall more in love with caring for people. I love my job, I love caring for my patients, and I love my family and friends. During these hard times of being a temporary single mother it's been a real struggle throughout this whole situation, but I've been so lucky and grateful to have the support and helpfulness of everyone. The Advent Health Hospital has gone above and beyond supporting me through this situation. That just goes to show how valued I am in this company.

James and I have been together for 10 years. Going into this relationship with him I know he comes from a deeply troubled past but more importantly how he overcame it. That's what drew me to him. His ability to change for the better. I know my husband goes out of his way for people. He has a kind heart. When we were dating, he saw two very old ladies having issues with their vehicle in heavy traffic. He went out of his way to help them and try to fix the problem. I was moved by this to see how despite his past, he is a good man. I've seen that throughout our marriage. He would take stray dogs off the street, clean them and find them a home, which in truth annoyed me because I'm not a fan of animals anymore. He helps his neighbors especially our neighbor Mona who husband died. James would mow

her lawn, be her transport, fix her car, and do anything she needed. He has helped a young couple in our neighborhood come into their own. He would drop anything he was doing in order to help my parents with anything they needed, especially car issues. James is great with cars. He is talented in fixing, building, and repairing anything really. James has his faults too. Just like a child who is willing to help you clean the house but not his own room, he was like that in our family life. He was willing to help others at a drop of a hat but dragged his feet with his own family at times. I mention this your Honor because I want you to know I see his faults and I see deep down he is a good person.

Sometimes I feel I should have seen what was happening under my nose. I was just too preoccupied with providing and the children to see it. I felt like if I had I could have stopped him and get him the help he needs. But I also feel maybe he needed this to happen. Some of us need hard lessons to see our faults and what we need to do in order to change. He has put his family through hell your Honor, and honestly, I didn't want to give him another chance with us. But he has expressed he is remorseful, he wants to change, and he is wanting to give his family 110% the way we deserve. God is a forgiving and loving God who doesn't judge. He views marriage as sacred. I am willing to give him one more chance with the kids and me. If he is showing signs of remorse and willing to change for the better, I'm willing to give that a chance. One more. As long as there are two parties who want to make the marriage work, I am willing to try. James wants an opportunity to prove that with actions not just words.

Here is my plan for my husband to keep him on the right track. First, I'm going to put him on my insurance to get him counseling he needs. He needs to unload his troubled past and upbringing so he can become a better person and be a better parent. Also parenting classes if that is available in my area. Fortunately, I also have the EAP (employee assistance program) to get him in faster with counseling. Because I am the sole provider of my family at the moment, I can't always be there. But I have spoken with family and friends who are willing to support me in checking on James throughout the day when I am not around. Once James comes back to being the caregiver for the children, I can slow down in my work to be home more instead of working extra to pay for a sitter. My father is moving near me soon to be around his grandchildren but also to be a good influence on James. I have friends and neighbors who know James and can check on him throughout the day. I will be more on top of his doings throughout the day to be sure he is out of trouble. I am also working on saving money for him to get his CDL license for him to work once that is allowed of him. I will do whatever it takes to prove Your Honor, that you have my word I will do my upmost best to keep James on the straight and narrow.

I want to thank you for taking the time to read this letter. I hope you can see that I am sincere in my words and someone who is credible. I know you are busy with so many cases, so I appreciate whatever time you have in reading this.


Sincerely,


Stephanie Molina

OTHONIEL MOLINA
1537 SPRUCE TERRACE
APT. C
TAMPA, FL   33607

(813) 898-3871


DEAR JUDGE SCRIVEN,

I AM A RESIDENT OF HILLSBOROUGH COUNTY MARRIED FOR 27 YEARS. I HAVE 4 CHILDREN RANGING FROM 23 TO 33 YEARS OF AGE. I AM A TRUCK DRIVER FOR XPO LOGISTICS FOR THE PAST 20 YEARS AND A MEMBER OF TAMPA BAY TABERNACLE. I AM A HIGH SCHOOL GRADUATE AND I HAVE COMPLETED 3 YEARS OF BIBLE SCHOOL AT NEWBURGH BIBLE INSTITUTE.

I HAVE KNOWN JAMES FOR NEARLY TEN YEARS. HE IS MY SON IN LAW IN WHICH I HAVE GROWN TO LOVE AND CARE FOR AS MY OWN. HE IS ALWAYS THERE FOR HIS FAMILY AND FRIENDS WHEN SOMEONE NEEDS A HELPING HAND. THERE HAS BEEN A NUMBER OF INSTANCES WHEN I HAD ISSUES WITH MY VEHICLE AND HE IS THERE

WITHOUT HESITATION. HE ALWAYS HAS A FRIENDLY DISPOSITION AND WOULD ASSIST HIS NEIGHBORS WITHOUT QUESTION.

My HOPE IS THAT HE RETURNS TO my daughter AND GRANDCHILDREN BECAUSE THERE IS A GREAT VOID WITH HIM NOT BEING HOME.

I BELIEVE THAT HE CAN RECEIVE HELP AND GUIDANCE OUT OF INCARCERATION THAN IN. I HOPE THE HONORABLE JUDGE WOULD TAKE THIS INTO CONSIDERATION.

THANKyou,

Mary Persinge
637 Blissfield R
Warsaw oh, 484
740-575-2315

Honorable Mary S. Scriven
United States District Judge, U.S. Carthouse
201. N. Florida Avenue
Tampa Florida, 33602

Re: United States V. Jerme John Ha

Dear Judge Scriven;

Im Mary Persinger Married 13 years, currently Separate
living with my fieance. I have 3 children
James 34, Julie 32. Custody of thier second
Cousin she's Christy now 42. Went thrugh
the 11th grade, Worked at Alliance Data
for 24 years was outsourced 3 years ago.
Now working at dollor General as a Key
holder. Been there 4 weeks now.

Im James Mother, He's my oldest
Son he's a very good man. James (J.J)
has always been there for me. He took
care of my mother with me when she was

very ill. He did everything for her. They had a very close relationship. They were buddies he rode with her everywher shopping, Doct Everywhere it was very helpful when she was so ill, she couldnt get around anymore he was there. She get cranky and ask every 5 minutes for something he did it all. So specice he has a huge heart.

I hope James can come home to his family. he is very close to his kids. They need thier father very much, I know he's very sorry for his bad choice. And wants to be the husband and father he's meant to be. I love him with all my heart and know he will be very good from now on. He knows he was wrong for this. His kids need him desportley.

Respectfully,

Mary Ramey

Honorable Mary S. Scriven, United States District Judge


My name is Garry Hall. I have been married for 15 years and have 2 girls ages 14 and 11. I have an associates degree in business management. I have been working for Duke Energy as a radiation protection tech at the Brunswick nuclear plant for 13 years. I have known James for over 25 years he is my half brother.

James is a good father to his 2 kids and good husband to his wife. He stays home and takes care of their kids while his wife goes out pursues her career in nursing. Every time we make a trip down to Florida, he makes a point to come and see us. Remember one trip we were in town and meet for dinner. He got me 2 Clemson shirts because he remembered that was my favorite team. And that same dinner he knew one of the kids didn't like anything at the restaurant. So left and went to a fast-food place to get his kid something to eat. He is a good man with a good heart.

It is unfortunate that he made some bad decisions, thus resulting in him in jail. While I was surprised to hear what he did, it comes as no surprise that he is ready to accept responsibility for his actions. I believe that as he moves forward, he will emerge a better person. James has expressed a sense of remorse in making such a serious mistake and I believe in his ability to make the right choices.

It is my sincere hope the court takes this letter into consideration at the sentencing. Despite the current case. I believe in my heart of hearts that James is an honorable individual, a valuable member of the community, and a good human being.


Sincerely,

Garry Hall

June 6, 2023

Honorable Mary S. Scriven

United States District Judge, U.S. Courthouse


Re: *United States v. James John Hall*


Dear Judge Scriven:

My name is Tommy Hall, I'm a divorced father of 2 children, Ashton & Braxton Hall, who are currently 19 years old. I'm currently working for Entergy at the River Bend Nuclear Power Plant in St. Francisville Louisiana as a Radiation Protection Supervisor. I've been in the nuclear field for 32 years. I'm also a veteran of the U.S. Navy and served in Desert Shield & Desert Storm.

James is my half brother and have known him since the day he was born.

James (JJ) was a happy child during the time I spent with him before I moved away. I regularly stayed in touch with JJ and he always seemed like he was doing well and in good spirits. Approximately 10 years ago JJ came to live with me in NC for about a year. JJ was always polite, worked hard and looked to succeed with a new start. He accomplished these things and bettered himself during his time with me. JJ then moved to Florida, due to a good job opportunity that he was offered and progressed with his life nicely. While in Florida, JJ met his current wife, Stephanie and had two wonderful children. He created a family and was the happiest I have ever seen him. He absolutely adored his wife, and his children were his world.

I hope JJ will learn from this tragic event and move past and grow. I want the best for him and his family. I pray he always does the right thing in life for every situation he finds himself.


Sincerely,

Tommy L. Hall

Charles Williams
38510 8th Ave, Zephyrhills
(813)665-3997

Honorable Mary S. Scriven
United States District Judge, U.S. Courthouse
201 N. Florida Avenue
Tampa, Florida 33602

re: United States v. James Hall (John)

Dear Judge Scriven:

My name ic Charles. I'm 25 years of age, I'm not married and I cant have kids, but I have a girlfriend. I'm a Line clearance Arbourest at Davey Tree. I've worked at my employer for nearly 6 years. I help out those I can whenever I can.

James is a friend of mine. Has been for about 2 years. He, helped me get a car find another place to live. Even now im caring for one of his chickens. This man has helped me learn a litte mechanics helping me with my truck. He and I would hang out and play games or cards when I woud get out of work. we would talk for hours about nothing and everything. Its been so quiet since he left.

I beleive I will see James again.
I hope he can come home to his
kids again.
I make no excuse nor do I ask
for anything. I'll use my time
wisely, and continue to make
sure his family is well.


Respectfully

Charles (Alex) Williams